Parker *v.* Hayes.

## BENJAMIN F. PARKER

*v.*

### ADMINISTRATOR OF DAVID A. HAYES, deceased.

1. A false representation, to be the proper subject of judicial action or cognizance, must be the cause of legal wrong or injury, and such cannot be the effect of a false representation made to a person who knows it to be false.

2. If an infant, being entitled to a sum of money on attaining twenty-one years of age, induces his trustee to pay it to him in advance of that time by fraudulently representing himself to be older than he is in fact, he will, in equity, be bound by the payment, but only to the extent of the payment actually made. If the trustee induces the infant to release the whole, on paying only a part of what is due him, the release will only be held good to the extent of the payment made.

On final hearing on bill and answer and proofs taken before a master.

*Mr. Stephen B. Ransom,* for complainant.

*Mr. Cortlandt Parker,* for defendant.

VAN FLEET, V. C.

This suit was commenced December 21st, 1868. It was brought by the complainant against David A. Hayes to compel him to render an acccount as guardian of the complainant, and to pay the complainant such sum as should be found to be due. As incidental to the relief just mentioned, the complainant also asked that a release which he had executed to Mr. Hayes should be declared to be of no effect. Issue was joined in May, 1869, and the complainant completed the taking of his proofs in November, 1870. Mr. Hayes, in 1871, under the act of 1862, took the evidence of certain witnesses residing in Illinois, but their evidence was suppressed in 1872 in consequence of the oppressive manner in which it had been taken, the examination of the wit-

NOTE.—See *Kerr on Fraud and Mistake 148; 3 Wait on Actions 443; Tyler on Infancy 53, 176; Wood* v. *Vance, 1 Nott & McCord 197; Hewitt* v. *Warren, 10 Hun 560.*—REP.

nesses having been stretched along, by adjournments, from April 21st, 1871, to the 20th day of June following. *Parker* v. *Hayes,. 8 C. E. Gr. 186.* Mr. Hayes was not examined, and after the evidence of his foreign witnesses was suppressed, no further step was taken in the case, by either side, until after his death. He died in November, 1875, but the suit was not revived against his representative until March, 1880. Subsequently, in 1883, the evidence of certain foreign witnesses, on the part of the defendant, was taken under commission, and the cause is now brought to hearing on the evidence taken in 1869 and 1870 and. in 1883.

The complainant's father, Isaac S. Parker, died in 1857, leaving a will, by which he gave to the complainant a legacy of $7,400, payable on his attaining twenty-one years of age, and. appointed his sister, the complainant's aunt, guardian of the complainant, and directed her to invest the legacy securely, at interest, on bond and mortgage of real estate, and apply the interest. to the complainant's maintenance and education. The testamentary guardian qualified, but was afterwards removed, and on the 15th of April, 1862, Mr. Hayes was appointed in her place. Between the date of his appointment and the 1st day of May, 1863, Mr. Hayes received for his ward cash and securities aggregating over $5,400. Over $4,000 of this sum consisted of interest-bearing securities against debtors resident in the state of Illinois. Prior to the issue of letters of guardianship to him,. Mr. Hayes constituted one Silas G. Randall, of the state of Illinois, his agent, and took from him a bond in the sum of $10,000, bearing date March 18th, 1862, with one Jesse Blinn as surety, conditioned that Randall should faithfully perform all. his duties as agent, properly fulfill and discharge all trusts confided to him by Hayes, and justly and promptly account for and. pay and deliver all moneys and property coming to his hands or control belonging to Hayes as guardian. Mr. Hayes, by his answer, states that, subsequent to the execution of this bond,. Randall obtained certain of the assets of his ward's estate and also some money, but he gives neither the value of the assets nor the amount of the money. He also says that Blinn, the surety of Randall, and who was connected in business with Randall,.

received, during the years 1862 and 1863, from the assets of his ward's estate, about $4,200, and made certain payments therefrom, but that after crediting such payments there was a considerable balance still due, which Blinn was unable to pay. For this balance Mr. Hayes brought suit against Blinn in one of the courts of Illinois, in the latter part of 1865 or the early part of 1866, which was still pending, untried, in May, 1867. Mr. Hayes, by his answer, also says that the complainant, with his mother, called upon him in the city of Newark in February, 1867, and then represented that he had, in the month of April of the preceding year, attained the age of twenty-one years, and requested a settlement. He says that in response to this request he insisted that, in view of the circumstances under which he had consented to become guardian, and what had transpired since his appointment, it would be unjust to require him to make a settlement then, but that the complainant should wait until the suit against Blinn was concluded, or take an assignment of that suit and release him. He further says that the complainant agreed to the latter part of his proposition, that is, that he would take an assignment of the suit against Blinn and release him, on condition, however, that he (Hayes) should lend him $500 to start in business and make no charge for his services as guardian. A time was appointed when this agreement should be carried into effect, and Mr. Hayes prepared the necessary papers, but at the time appointed for their execution the complainant did not appear. Mr. Hayes afterwards had an interview with him, when the complainant informed him that his previous statement respecting his age was incorrect, and that he would not become twenty-one until the ensuing April; that it was then arranged that the complainant should at once return to Illinois, and that when he became twenty-one the terms of the settlement as previously agreed upon should be carried out; that in pursuance of this understanding he, some time in the month of April, 1867, sent to his attorneys in Illinois a check for $500, payable to the order of the complainant, with direction to deliver it to complainant on his giving his note for $500 and executing a release, releasing him (Hayes) from all liability as his guardian,

and likewise directed his attorneys to put the complainant in control of the suit against Blinn, and to do whatever might be necessary to enable him to prosecute that suit for his own use and benefit, and also to execute to the complainant a discharge for any compensation he might be entitled to as guardian.

Up to this time Mr. Hayes had not accounted with the complainant, nor in any way informed him of the amount of the estate which had come to his hands as guardian, nor of the sum he would be entitled to on attaining his majority. No account was ever rendered. The answer makes no claim that a settlement was made, or that an account was rendered, and the proof on the part of the complainant is undisputed, that no account of any kind was ever rendered by Mr. Hayes to the complainant. The proofs show that, on the 3d of May, 1867, Mr. Hayes wrote to the complainant, stating that he had sent a check for $500 to his attorneys in Illinois, for him, and also informing him that he had just received information that Blinn's sons were desirous of making a settlement. He requested the complainant to go and get the check, and also to see if he could not come to an agreement with Blinn's sons. The arrangement which this letter indicates as existing between the complainant and Mr. Hayes, is quite inconsistent with that set up in the answer. The letter does not say that the complainant, on receiving a loan of $500, and an assignment of the suit against Blinn, was to release Mr. Hayes, but, on the contrary, that on receiving an advance of $500 from Mr. Hayes, he should wait for a final settlement of the guardianship matter until Mr. Hayes could effect a settlement with Blinn. These are its words:

"I promised to advance you $500 when you became of age, for which you agreed to give me your note, and wait until I could get a settlement with Blinn to close up our matters."

Between the date of the letter just mentioned and the 18th of May, 1867, a further demand for an accounting was made on behalf of the complainant. This is shown by a letter written by Mr. Hayes to the complainant on the date last mentioned, in which he says that he has been visited by a gentleman who

called by direction of the complainant's mother, and wished him to pay the whole amount due to the complainant. The letter then proceeds :

" You well know that I undertook this guardianship at the earnest request of your mother, when she could not find any friend to assist her, and that I did it as a matter of charity for her and you. I do not wish to have any trouble with you, but I cannot think you have done this of your own accord. After all I have done for you I should have thought you would at least have written to me about it. If you will think of what I have done for you, you must say that it was not treating me right. Write me and let me know if . this is your doing, or some one else influencing you. Let me also know if you intend to take the money and come to the arrangement you promised when here. * * * * * If you are willing to make any arrangement with Blinn—Mr. Brown says the son of Blinn has made a very good offer of settlement, which he thinks you will accept—I have authorized Mr. Brown to say what I will do if you will accept the offer, and still leaving. a claim for the whole amount against Randall."

At the date of these letters, the complainant resided about one hundred miles distant from the town in which Mr. Hayes's Illinois counsel resided. Mr. Blinn lived in the same town, so that the complainant in going for the $500 was placed in a situation where it was easy to bring him in contact with Blinn.

The complainant visited Mr. Brown, the Illinois counsel of Mr. Hayes, on the 25th of May, 1867, and on being told that he could have the $500 on giving his note for it, replied that he ought not to be required to give his note for money that belonged to him, and then said that Mr. Hayes had written to him that Blinn wanted to settle, and that he would like to see Blinn to talk the matter over with him. The complainant was accompanied by his father-in-law. They were both taken by Mr. Brown, not to Blinn, but to the office of Hosmer P. Holland, a lawyer, and the son-in-law of Blinn, and introduced to him. Mr. Brown says that they returned to his office in less than two hours, and on their return, the complainant stated that he agreed upon a settlement, and made known its terms. He says he expostulated with the complainant against such precipitate action, and told him he would not consent to a settlement until the complainant had made a personal examination of such of the

lands he had agreed to take as lay near them, but the settlement, as agreed upon within the two hours, was carried out on the 28th of May, in the presence of Mr. Brown; the complainant having, in the meantime, made a personal inspection of two or three of the tracts. By the terms of the settlement, the complainant agreed, on the payment of $500 in money and the conveyance of one hundred and twenty acres of land in Iowa, two tracts of land of forty acres each, situate in Winnebago county, Illinois, seven town lots in the town of Stirling, Illinois, and one lot in the city of Rochford, Illinois, valued together at $3,620, making a total, with the cash payment, of $4,120, to release both Hayes and Blinn. The necessary legal instruments to carry this agreement into effect were executed on the 28th of May, 1867. The complainant assigned to Mr. Hayes, in addition, all claim which he then held against Randall, together with his right to any moneys which might thereafter be obtained from him on his bond. This arrangement, Mr. Brown says, constituted no part of the agreement of settlement, but was the result of negotiations which took place between the complainant and himself after the terms of settlement were agreed upon, and that although he regarded the claim against Randall as of no value, he procured the complainant to assign it, because he had an impression that Mr. Hayes wanted it, thinking he might possibly, at some future time, induce Randall to pay something on it. At the time the other papers were executed, a release by Mr. Hayes to Blinn was prepared and subsequently sent to him, which he executed and delivered to Blinn, but the complainant does not seem to have had any further connection with it than to have been present when it was drawn, and he may possibly have heard it read; but it is not shown to be true, as the answer alleges, that this release was prepared and sent to Mr. Hayes for execution, by direction of the complainant, and that after execution it was returned to the complainant, and by him delivered to Blinn.

As will have been seen, the material question of the case is, Is the complainant concluded by the settlement, or is his right of action cut off by his release? The proofs show quite as strongly as, I think, such a fact can be proved in ordinary cases,

that the complainant was under the disability of infancy at the time the settlement was made, and did not reach the age of twenty-one years until the spring of 1868. His mother, the physician who attended her at the complainant's birth, his maternal grandmother, his uncle and his elder brother, all swear that the complainant was born in the spring of 1847. There is no opposing evidence by the mouth of a single witness pretending to have knowledge of the fact, and the only evidence which can be regarded as standing at all in conflict with that just recited, is the averment of the answer that both the complainant and his mother, in February, 1867, fixed the date of the complainant's birth first as two years earlier, and then as one year earlier than the date fixed by these witnesses, and by the representations proved to have been made by the complainant as to his age, at the time of the settlement. The evidence, however, respecting the fact, will justify but one conclusion, and that is, that the complainant was born in the spring of 1847, and was, consequently, incapable of making a valid contract when the settlement was made.

But, it is contended, that notwithstanding the complainant's infancy at the time of the settlement, he is concluded by it, and bound by his release to the same extent that he would have been if he had been an adult, because he induced the person whose property he obtained to deal with him as a person of full capacity, by fraudulently representing himself to be of full age. The fact that he made such representation is fully established. Three of the five persons present at the execution of the papers, which were designed to give effect to the settlement, swear that, pursuant to a plan previously arranged, the person who witnessed the execution of the papers asked the complainant if he was then of age, and that he replied that he had attained twenty-one years of age the preceding April. The complainant, on the contrary, says that he did not, on that occasion, state his age to any one, while his father-in-law, who was also present, although examined on the part of the complainant, gave no testimony whatever on this point. So that, it will be perceived, the decided weight of the evidence is that such representation was made.

But this evidence does not go far enough to help the defendant. Mr. Hayes was not present at the settlement, and could not, therefore, have been deceived or defrauded by any false representation made there. Besides, it is said that Mr. Hayes knew the complainant's age. The complainant's mother swears that she told Mr. Hayes, in 1865, that the complainant's birth occurred in 1847, and that she repeated this statement to him, in substance, in 1867. If this is true, he could not have been deceived by any previous misrepresentation, nor by any recital or declaration contained in the release respecting the complainant's age, but, on the contrary, knew, when the release was delivered to him, that it had been executed by a person who was legally incompetent to do such an act. A false representation made to a person who knows it to be false is not, in legal estimation, a fraud. True, it is a falsehood, and perhaps, judged according to moral standards, it is none the less sinful because spoken to a person who cannot be deluded by it, but a false representation, to be the proper subject of judicial action or cognizance, must be cause of legal wrong or injury, and no such result can follow where the representation is made to a person who knows it to be false, for in such case he cannot be deceived by it, and if he acts on it, his act will not be the result of deception, but of his own folly. But opposed to the truth of this story, stand both the oath and conduct of Mr. Hayes. He was required to answer under oath, and has done so. By his answer, he affirms that the complainant represented to him, shortly before he returned to Illinois in the spring of 1867, that he had recently examined their family record, contained in the family Bible, and found, from the date of his birth as there recorded, that he would become twenty-one years of age in April, 1867. But the two letters written by Mr. Hayes in May, 1867, already referred to, furnish, as I think, much stronger evidence. In the first he says, in substance:

"I promised to advance to you $500 when you became of age. I have sent the money, in fulfillment of my promise, to my attorney; I want you to go and get it. You agreed to give your note for it, and to wait for the balance of what I owe you until I can get a settlement with Blinn."

This language will bear but one interpretation—the $500 had been sent because the complainant had attained full age, and had a right, therefore, to demand it; he had a right also, for the same reason, to demand any additional sum which might be due to him, but he had agreed not to do so for the present, but to wait until Mr. Hayes could effect a settlement with Blinn. Unless the letter was written as a step in a very deep and desperate plot, it must be regarded as furnishing very strong evidence that the writer was under an honest belief that the complainant had attained his majority. The second letter furnishes even stronger evidence that that was the fact. In that letter, it will be remembered, Mr. Hayes informs the complainant that he had been visited by a gentleman who claimed to represent him, and on his behalf required the payment of the whole amount due at once. The demand, viewed from Mr. Hayes's standpoint, involved the violation of the complainant's promise, and would, therefore, naturally have excited his opposition and provoked him to resist by all the means in his power. If he had entertained the slightest doubt about the complainant's right to make such a demand, in consequence of his minority, he would have made that doubt known in this letter; nay, I think it is manifest that he would have gone further and denied the complainant's right to make such a demand, especially if it had been true that he could have justified himself in that course by simply confronting the complainant with his mother's statement, made less than three months before, that he was still a minor. But he took no such ground; on the contrary, he conceded the complainant's right, so far as his age was concerned, to make the demand, and the only resistance he made against it was, that the complainant was violating his promise, and threatening to deal so unjustly with him, in view of what he had done for the complainant, that he could not believe that the complainant was acting according to his own mind, but rather in obedience to some influence inimical to both of them. It is utterly impossible to reconcile Mr. Hayes's conduct with the existence of doubt in his mind as to the complainant's age, much less can it be believed that he possessed, at the time these letters were written, certain

and definite knowledge that the complainant was still a minor. If he had possessed such knowledge, his safety lay in declaring it, not in concealing it. He had no motive to conceal it. If he had possessed it, his natural impulses, quite as strongly as his safety, would have impelled him to make it known. The fact that he did not, renders it almost absolutely certain that he did not possess such knowledge. The proofs, in my judgment, show that at the time Mr. Hayes remitted the $500, as also when he received the release, he believed that the complainant had attained his majority, and that that belief rested on representations made by the complainant himself. And it is not at all difficult to believe that the complainant had been guilty of such misrepresentation to Mr. Hayes, when it is remembered that it is proved, in such manner as almost to exclude doubt, that, when he was appealed to at the time of the settlement to state his age, he gave the same false answer then that Mr. Hayes says he had previously given to him.

But deciding the question of fraud against the complainant does not necessarily involve the denial of all relief to him. Infancy is a legal privilege. The release upon which the defence rests is, at law, without the slightest force. It is no answer at law to the fact of infancy, that the person dealing with the infant was induced to do so by the infant's fraudulent representation that he was of full age. *1 Chitty on Cont. (11th Am. ed.) 195*. The rule in equity, however, is different. In equity, in the language of Lord King, infants have no privilege to cheat men. If an infant obtains property by fraudulently representing himself to be of full age, equity will compel him either to pay for the property or to surrender it. *Evroy* v. *Nicholas, 2 Eq. Cas. Abr. 488 ; Clarke* v. *Cobley, 2 Cox 173*. So, if he engages in business and incurs debts by fraudulently representing that he is of full age, and is afterwards adjudged a bankrupt, the debts so incurred may be proved against his estate. *Ex parte Unity Bank, 3 De G. & J. 63*. And so if he is entitled to a sum of money on attaining twenty-one years of age, and he induces his trustee to pay it to him in advance of that time by falsely representing himself to be older than he is, he will, in equity, be

bound by the payment (*Cory* v. *Gertcken, 2 Madd. (40) 362*), but only to the extent that he actually receives payment. If his trustee, on paying him only a part of what is due, induces or procures him to release the whole, the release, being void at law, will only be held good, in equity, to the extent of the payment actually made. *Overton* v. *Banister, 3 Hare 503.* The justice of this rule is manifest. At law, an infant is incompetent to make a valid contract except in certain exceptional instances. He may be old enough and cunning enough to contrive and carry out a fraud, yet, if he does, the law is powerless to give redress. The law cannot prevent him from using the shield which was intended simply as a protection, as a cover for his own cheating. Equity, to correct this wrong, steps in and declares that when an infant induces another to deal with him by fraudulently representing himself to be of full age, that, to the extent that the contract is just and fair to him, and also to the extent to which it is necessary to hold him to it to prevent him from reaping the fruits of his fraud, he shall be compelled to abide by it.

Tried by this rule, it is clear that the release does not bar this action. The complainant is entitled to an account. No account has ever been rendered to him. And this, in my view, is one of the most decisive facts of the case. Moreover, it is impossible to scan the proofs, even cursorily, without seeing that, when it became evident that somebody must suffer loss in consequence of the guardian's transactions with Randall and Blinn, the guardian was eager to put the complainant in a position where he would be compelled to bear it. He confesses by his answer that a bargain was actually made, and that he drew the necessary papers to carry it out, whereby he was to be released from all liability to the complainant on lending him $500 and assigning to him a suit against a worthless or insolvent debtor. The complainant had a right to a full and specific account from his guardian; he had a right to know just what estate his guardian had received, what had been done with it, and what sum still remained due to him. It was the duty of his guardian to inform him fully and accurately as to his rights, even as to those which

existed against the guardian himself. The answer does not pretend that the guardian performed these duties, or either of them, but it would seem that he either sent or allowed the complainant to return to Illinois utterly ignorant of the condition of his estate, and shortly afterwards, with full knowledge that the complainant, for want of information, was wholly incompetent to deal with such an affair, either safely or intelligently, requested him to go to Blinn and see if he could not effect a settlement, stating that a settlement might be so made with Blinn as still to leave a claim for the whole amount due against Randall. The guardian must have known that this statement, while without the least foundation in truth, was likely to exert a powerful influence on the mind of the complainant, for it cannot be believed that the guardian, who was a lawyer of experience, did not know that the law would not allow a creditor to collect the same debt twice. When the complainant made the settlement with Blinn, he was ignorant of the amount of Blinn's indebtedness to his guardian, and it appears that even Mr. Brown, the guardian's counsel, did not, at that time, know the amount of Blinn's liability. In view of these facts, it is entirely clear that if the complainant had been otherwise competent, he was incapable of negotiating a settlement so as to take proper care of his own interests, for the want of information which his guardian could alone furnish him. Besides, it appears that the sum paid on behalf of Blinn, in the settlement, did not cover the full amount of his liability. Mr. Holland says that it was a little short of the whole amount due, but that he is unable to state either the whole amount due or the actual amount of the deficiency. These facts render it perfectly plain that the complainant's guardian lured him into making a settlement by which he got neither what he was entitled to nor all he was entitled to. No principle of justice requires the court to compel a minor to abide by a contract obtained by such means.

An account will be decreed. The complainant, while still a minor, conveyed one of the tracts conveyed to him by Holland, to a person whose name is not given in the pleadings, and the residue to his mother. She, since then, has conveyed another

Parker *v.* Hayes.

tract to a third person.   She is not a party to this suit.   The court, therefore, has no control over the title to these lands, and the complainant must, in the accounting, be charged with their fair value.   But I am not satisfied that the sums the complainant agreed to pay for them represented their fair value at the time the settlement was made.   Mr. Holland says that he had owned the lands about a year prior to their conveyance to the complainant, and that he conveyed them at an advance of about twenty-five per cent. over the prices he had paid.   The only witness, except Mr. Holland, who speaks on the question of value, on the part of the defendant, names, as the minimum price of two of the tracts, sums considerably less than those at which the lands were conveyed.   When it is remembered that the complainant was enticed into the settlement without any knowledge whatever respecting the value of these lands, and the influences by which he was surrounded at that time are considered, I think it is manifest that he should not be charged for the lands at the prices then agreed upon, without further evidence that they were reasonable and fair.   By the terms of the gift to the complainant, his legacy was not payable until he attained twenty-one years of age, but the legacy was, in the meantime, to be invested, and the interest applied to his maintenance and education.   By the account annexed to the answer, the total of the allowances claimed for each year from 1862 to 1867 exceeds the sum which the legacy could have earned as interest—those for 1862 exceed $900, and those for 1864 exceed $800.   Circumstances may have existed which justified an allowance in excess of the interest, but until such is shown to be the fact, the annual allowance to be made for maintenance and education must be limited to the interest of the legacy.

A decree in conformity to the views above expressed will be advised.