22 N.J. Super. 503 (1952)
92 A.2d 390
SCHOHARIE COUNTY COOPERATIVE DAIRIES, INC., A CORPORATION, PLAINTIFF-APPELLANT,
v.
ISADORE EISENSTEIN, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 1952.
Decided November 7, 1952.
*504 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Walter D. Van Riper argued the cause for plaintiff-appellant.
Mr. John E. Toolan argued the cause for defendant-respondent.
The opinion of the court was delivered by FRANCIS, J.C.C.
The complaint herein charged that defendant and others conspired to perpetrate a fraud upon appellant for the purpose of extorting money from it. At the trial, after appellant's evidence had been introduced, *505 respondent's motion for judgment was granted. The reasons assigned by the trial court were: (1) that no evidence had been adduced to show fraudulent representations by respondent; and, (2) that appellant was aware that the money paid respondent was to be used for an unlawful purpose; consequently, being in pari delicto, no recovery could be had.
Basically the complaint sounds in fraud and the trial seems to have been conducted on that theory. In such an action the plaintiff must establish certain elements as a prerequisite to the right of recovery. It must appear: (1) that the person sued made false representations to the plaintiff as to present or past material facts, (2) that he knew they were false when made, (3) that he made them intending the plaintiff to act upon them, (4) that the plaintiff did act in reliance upon them and, (5) that damage resulted therefrom. Williams v. De Fabio, 3 N.J. Super. 182 (App. Div. 1949); Byard v. Holmes, 34 N.J.L. 296 (Sup. Ct. 1870); Restatement of the Law of Torts, sec. 525.
The course of our review of the action of the trial court in granting the motion for judgment for respondent is charted by certain fixed principles. The evidence and all of the inferences deducible therefrom must be taken in the light most favorable to the plaintiff's claim and if upon an examination so guided the minds of reasonable men might differ as to whether or not the elements referred to have been demonstrated, the problem must be submitted to the jury for determination. Gentile v. Public Service Coordinated Transport, 12 N.J. Super. 45 (App. Div. 1951).
The proof showed that appellant corporation, Schoharie County Cooperative Dairies, Inc., is a dairy cooperative made up of about 500 farmers. At the time of the events under consideration these farmers were producing about 132,000 quarts of milk daily. This milk was processed by Schoharie and sold to the Middletown Milk and Cream Company of Middletown, New York, which in turn sold it at retail in various places, including the City of Newark.
*506 Schoharie held a permit from the Board of Health of the City of Newark to sell its milk in the city. This privilege of selling the milk is spoken of in the record at some times as resulting from the holding of a permit and at others as the result of being on the list of dealers whose milk is approved for sale.
Prior to May 1950 in the departmental structure of the city the board of health was in the department of public affairs and the deputy director of that department was one Ira Goodman. Joseph Connolly was assistant health officer in charge of the food, drug and cosmetic division of the department of health, and David Morgan was acting chief inspector of the division. Morgan's duties were to advise and consult with Connolly in the enforcement work of the division.
Some time shortly after March 20, 1950 Connolly was told by Goodman that Richard F. Powell, one of the inspectors, was to act as his advisor and consultant in milk matters. Thereupon Morgan ceased acting as such. Powell and the respondent Eisenstein, who was in the milk business, had been friends for 25 years or more and visited at each other's home.
In the latter part of May 1950 Schoharie was given notice of a hearing before Assistant Health Officer Connolly as to the revocation of its permit to sell milk or to have its milk sold in the city. In 11 years of operation none of its permits had ever been suspended previously. On May 24 the hearing was held and appellant was represented there by counsel engaged by Middletown Milk and Cream Company. Before the hearing took place, for some reason not appearing in the record, Goodman told Connolly to "hold his decision up" and this was done. However, thereafter Goodman instructed him to revoke the permit and on May 26 Connolly directed the health officer to send a letter to Schoharie notifying it of the revocation.
On Thursday, May 25, Edward O. Mather, president of Middletown Milk and Cream Company, received a telephone call from Eisenstein, whom he had known since 1938. *507 Eisenstein asked Mather to come to his office in New York City to see him and said that it was particularly important. Mather agreed to do so the following morning. At about 9 A.M., Friday, May 26, he arrived at the office and, after some general conversation, Eisenstein remarked that it looked as though Mather's company was in trouble in Newark. Mather agreed, then asked if he had any thoughts about it and Eisenstein replied that the best thing to do was to hire an attorney, but not the one who represented his company at the hearing. On asking for suggestions Eisenstein said he would think about it over the weekend and call Mather on Monday. And he told Mather to keep his name "out of the picture." This same afternoon, on Mather's return home, he told Dr. Kenneth A. Shaul, president of Schoharie, of the conversation but, as requested, withheld Eisenstein's name. Mather was advised by an official of the Middletown company that the secretary of the board of health had notified him that telegrams were going out taking Schoharie's name off the approved dealer list.
On Monday morning, around 9:30, Eisenstein called Mather, suggested as the proper attorney to engage, Edward T. Miller of Newark, and in answer to Mather's inquiry said the fee "in the Cobbleskill matter" would be $7,500. The expression, "in the Cobbleskill matter," was used because, according to Mather, "there was another case that had been taken off the approved list." This information was communicated to Shaul who took the matter up with his board of directors; then later in the afternoon drove to Mather's office with a check for $7,500 made out to Miller. Eisenstein was called by Mather (who continued to withhold his identity from Shaul) and Eisenstein told him Miller would be in his office in Newark on their arrival there.
Shaul, Mather and an employee of Middletown arrived in Newark in the early evening and Shaul went to Miller's office.
The record discloses that Miller and Eisenstein had enjoyed a "very close business relationship." However, he had never *508 represented Eisenstein in any milk matters; he had never handled any milk matters for any client; and he had never taken care of any matters whatever with the Newark board of health. Eisenstein had telephoned him on Friday, saying that Dr. Shaul "would probably come in" and that "it would be worth a fee of $7500." Miller said that Eisenstein suggested the $7,500 figure but that he actually fixed it. Eisenstein, on cross-examination, admitted that in another proceeding he had testified to the effect that he fixed the fee without consulting Miller.
Shaul's conference with Miller took about 10 to 15 minutes. When Shaul tried to discuss the facts of the case, Miller showed no interest; he made no notes of any kind, asked no questions about the sanitary conditions at Schoharie's plant, and answered no questions about the case itself. He asked Shaul if he had the check, which seemed to be his only interest. When it was produced, he inquired if the doctor had not been told to bring a certified check. Then, after Shaul offered to call the cashier of the bank on which the check was drawn so Miller could talk with him and verify its sufficiency, Miller accepted it, and he gave Shaul a receipt stating that the money was in payment for legal services. Even at this point no inquiry was made about the facts of the case, nor for Shaul's telephone number nor as to where Shaul could be reached. Shaul asked if he would hear soon and Miller replied in the affirmative. This ended the conversation.
Shaul rejoined Mather and they returned home, the former to Cobbleskill, New York, and the latter to Stamford, Connecticut. When Shaul arrived home he learned that Powell had called at about 9:15 P.M. and advised that Schoharie had been reinstated. This was slightly over three hours after he left Miller. At about 10 or 10:30 P.M. Mather likewise received a call from Powell, whom he did not know and with whom he never had any dealings, to the effect that he was calling on behalf of Connolly to notify him that Cobbleskill was back on the approved list.
*509 The period involved here was the Decoration Day weekend. The health department was closed Saturday through Tuesday, the latter being Decoration Day. The record discloses that Connolly had left Friday for the week-end and on his return Wednesday morning learned of the reinstatement. There is no evidence whatever that anyone spoke to him about the matter between the time of the suspension and his return on Wednesday morning.
According to Miller he telephoned Goodman at the City Hall on Friday. The only reasonable inference is that this was after being informed by Eisenstein that Dr. Shaul would probably be in to see him. He did not say he discussed the merits of the Schoharie cause with Goodman then, even though he claims to have had some suggestions as to its nature from Eisenstein. So it is fairly inferable that he called to tell Goodman that Eisenstein had reported Shaul's probable visit.
In any event, according to Miller, Goodman told him that the City Hall would be closed on Monday. Then Goodman suggested that if Miller wished, he could call him at home Monday evening and Miller was given his private and unlisted phone number. Singularly enough, when Goodman was on the witness stand, he said he did not know Miller and met him for the first time on the day they were arraigned on the indictment arising out of this transaction. Then he said Miller did call him on his unlisted telephone at home on the Monday evening in question and that he had previously given the number to him.
In any event, Miller called at about 6:30 P.M. Monday, discussed the case with Goodman at that time and persuaded him to restore Schoharie to the approved list. However, he could not remember what the violations were that he claimed to have discussed with Dr. Shaul and he had made no notes of them nor did he have the testimony taken at the hearing. After Goodman agreed to notify appellant of the restoration and made it plain that the action necessary to accomplish the result would be set in motion immediately, according to *510 Miller, he asked for a memorandum indicating his (Miller's) reasons for the reinstatement. Miller made no effort to communicate his success to Shaul; that was left to Goodman. He did nothing in this direction until Shaul called him on Wednesday and asked him to obtain some official confirmation of the telephone message Schoharie had received.
Following the Monday evening conversation with Goodman, Miller went to Eisenstein's home in South Orange, New Jersey, and disclosed the receipt of the $7,500 check. And he maintained that after consulting with Eisenstein at this time and again on Tuesday afternoon, on Wednesday morning he wrote a three-page memorandum as to the reasons why the reinstatement was proper and delivered it to Goodman. Although the testimony about the memorandum was developed by defense counsel on cross-examination of Miller, no explanation was sought or given as to its contents; nor was the memorandum produced for identification by Miller.
The Schoharie check for $7,500 was deposited by Miller in his trustee account, where attorneys are accustomed to keep clients' funds. Later on June 5, 1950, presumably after it cleared, he issued a check for $7,000 to Eisenstein and the record contains no statement of either Miller or Eisenstein as to why the payment was made. No disclosures appear as to what Eisenstein did with the money. Miller admitted he did not advise Dr. Shaul that any part of the fee was going to Eisenstein and Eisenstein conceded that he told Mather to keep secret his participation in the arrangements for Miller's appearance in the case. And Mather said as late as July 1950, while the prosecutor was investigating the matter, that Eisenstein asked him not to disclose the fact "for the moment."
Eisenstein, Miller, Goodman and Powell were called as witnesses by the plaintiff. Each admitted that he had been convicted of the crime of conspiracy to extort from Schoharie the money which is the subject of this action. In the case of Eisenstein, Miller and Powell the question as to the conviction *511 of crime was asked and answered without objection. When the inquiry was made of Goodman an objection was interposed but overruled on the basis of State v. Fox, 12 N.J. Super. 132, 139 (App. Div. 1951). But no request was made to the court to limit the purpose of the question and answer to the issue of credibility.
The trial court concluded that the record was barren of the necessary evidence to support an action for fraud, and further that as a matter of law appellant's voluntary and knowing participation in the illegal scheme barred recovery. We are convinced that this was error and that a factual issue was presented on both subjects which required determination by the jury.
Defendant argues that the case is deficient in several respects. First, no evidence was introduced to show a representation by Eisenstein that Miller would furnish legal services; second, that, in any event, under the proof, Miller did render legal services; third, that appellant placed no reliance on the representation that Miller would perform legal services; and, fourth, since appellant knew, through its agent, Dr. Shaul, that the $7,500 was to be used for an illegal purpose, public policy precludes recovery. And here the suggestion is that Shaul knowingly paid a bribe to public officials. None of these grounds is meritorious.
Without detailing all of the proof on the subject it is plain that an aura of experience and expertness in milk permit cases was thrown around Miller by Eisenstein. In words and conduct he represented that what appellant needed was an attorney who was better equipped in knowledge and experience to represent it in order to forestall suspension or to procure restoration to the approved dealers list if suspension occurred, and that Miller was the man. Shaul said that when he conferred with his board of directors on the matter of retaining Miller and the size of his fee, they and he felt that the fee was high. However, the cooperative had never been in any difficulty of the kind before and consequently there had been no occasion to engage a lawyer to handle such *512 a case; they had no idea how long it would take or how much work would be involved and so, as Shaul put it, they had no guide by which the propriety of the fee could be determined. Moreover, Shaul explained that the recommendation of Miller had come through Mather of the Middletown company, who was supposed to have obtained the information as to the attorney to be retained from a reliable source. And as Shaul put it, Middletown having a vital interest in the Schoharie milk supply, he felt that "great care" would be shown in selecting an attorney "who could handle the case."
But, respondent says, Miller did, in fact, render legal services. Here again the inquiry is not limited by the appearance or the form; we look through the form to the substance in order to determine whether reasonable men might differ as to the fact.
It is true that Miller says he talked to Goodman on the telephone at his home, discussed the case with him, obtained an immediate decision to reinstate Schoharie, and then a few days later filed the three-page magnum opus, the contents of which are undisclosed. In a different setting such conduct undeniably would constitute legal services. However, here another and conflicting inference may be drawn, namely, that pseudo services were rendered to give color of validity to the scheme to defraud. We cannot overlook the undisputed evidence of Miller's complete lack of knowledge of and experience with milk permit cases, and that he did not have the benefit of the transcript of the testimony taken at the board of health hearing. Further Miller said he discussed the matter in detail with Goodman and was able to do so because Dr. Shaul had supplied him with information and Eisenstein had given him some suggestions. However, he was unable to remember any of the violations Dr. Shaul allegedly told him about in their remarkably short conference; Shaul denied that the case was discussed at all with him, and Eisenstein made no mention about having briefed him on the subject. When consideration is given, (1) to Miller's call on an unrevealed subject to Goodman on Friday *513 before Dr. Shaul came to the office, Goodman, so far as the record discloses, being a person he did not know and with whom he had no prior dealings, (2) to the call on Monday night to Goodman on the unlisted phone, almost immediately after Shaul had delivered the $7,500 check, and (3) the immediate reinstatement of Schoharie, it would be open to a jury to find that Goodman was being given information about the impending payment of the $7,500 and later, about the fact of the payment, and that Goodman ordered the restoration of appellant to the approved list in response to the payment and not to any legal services which Miller rendered or intended to render. Beyond this, what inference may be drawn from Miller's hasty relinquishment of $7,000 to Eisenstein? One inference is that by turning over fourteen-fifteenths of the $7,500 he labeled his participation in the transaction as a mere conduit through which the proceeds of the fraudulent scheme passed to Eisenstein. And another inference is that the $500 he retained represented his share of the fraud and not payment for legal services rendered to Schoharie.
The last two contentions of respondent can be treated together. They are that Dr. Shaul placed no reliance on any representation that Miller would supply legal services, and that he was aware that the money was being paid for an illegal purpose. Of course, the general principle is that if a person claiming to have been defrauded did not rely upon the representations made to him he has no cause of action. Or if he knows that money paid by him is to be used for an illegal purpose, such as, to bribe a public official, public policy bars a recovery. Zelman v. Kaufherr, 76 N.J. Eq. 52 (Ch. 1909); Hope v. Linden Park Blood Horse Association, 58 N.J.L. 627 (E. & A. 1896); Brooks v. Cooper, 50 N.J. Eq. 761 (E. & A. 1893); Parker v. Hayes, 39 N.J. Eq. 469 (Ch. 1885), reversed 41 N.J. Eq. 630 (E. & A. 1886); 12 Am. Jur., Contracts, sec. 212; Restatement of the Law of Torts, sec. 541.
*514 Here again conflicting facts and inferences appear which create a problem for the triers of the facts and not for the court. As already indicated, throughout the course of Dr. Shaul's testimony he asserted a belief that he was engaging a skilled attorney to handle a serious and important problem.
Evidence was developed on his cross-examination to the effect that after turning over the check he was suspicious because of Miller's lack of interest in the facts of the case; that one or more of his directors regarded the fee as exorbitant and said that they were being held up; that Shaul did not stop payment on the check although he was skeptical as to the legitimacy of the transaction when Miller produced such expeditious results; that later, after the check had cleared and after he had talked with a number of other persons about the matter, he said he felt as though he had participated in a crime and that he had used the farmers' money improperly. These are all matters for a jury to weigh in determining whether he was a victim of fraudulent representations or a willing actor in an illegal affair.
It must be kept in mind that the law leans toward protecting even the foolishly credulous against the machinations of those who would defraud. Lake v. Thompson, 366 Pa. 352, 77 A.2d 364 (Sup. Ct. 1951). Our present Supreme Court recently spoke in this field as follows:
"It is the policy of the law to protect the unwary and foolish as well as the vigilant from the wiles and artifices of evil-doers and negligence in trusting a representation will not, according to the greater weight of authority, excuse a positive wilful fraud * * *. The party perpetrating the fraud should not be permitted to say that he should not have been believed or trusted." Peter W. Kero, Inc. v. Terminal Construction Corp., 6 N.J. 361 (1951).
In fact the modern trend of the law seems to be in the direction of greater tolerance of credulity. Prosser on Torts, sec. 88, p. 749. For example, the Supreme Court of California said bluntly that "No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool." Seeger v. Odell, 18 Cal.2d 409, 115 P.2d 977, *515 136 A.L.R. 1291 (Sup. Ct. 1941). Further there is authority for the proposition that the less guilty party to an illegal transaction will not be considered in pari delicto and thus barred from recovery, "where although the parties concur in the illegal act, some fraud, duress, oppression, imposition or undue influence is practiced by one party upon the other so that it appears that the guilt of the latter is subordinate to that of the former." 12 Am. Jur., Contracts, sec. 219. However, we find neither need nor occasion to consider such a doctrine here.
Appellant lays much stress on the admission by Eisenstein that he had been convicted of conspiracy to extort the money which is the subject of this action. The weight of authority throughout the country supports the view that a conviction in a criminal prosecution after trial is not admissible to establish a civil cause of action arising out of the same facts. Sorbello v. Mangino, 108 N.J. Eq. 292 (Ch. 1911); 31 A.L.R. 262; 57 A.L.R. 504; 50 C.J.S., Judgments, sec. 754 b, p. 269. If the conviction of Eisenstein had been received with the limitation imposed by State v. Fox, supra, namely, for the purpose of informing the jury of a pertinent aspect of his credibility, it could not be considered as substantive evidence in support of the plaintiff's case. However, no such limitation was sought or imposed and no objection was made to its admissibility. It may well be that respondent considered it advisable to offer no objection, believing that the proof would have a tendency to support his in pari delicto theory. In any event, the probative force thereof being unrestricted, the conviction provided some substantive evidence of the merit of appellant's cause of action.
Under all the circumstances it is our conclusion that a jury question as to respondent's liability was presented and that the trial court erred in granting the motion for judgment. Accordingly the judgment is reversed and a new trial ordered.